**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00495-CV**

_____

**IN THE INTEREST OF L.D.M.W.**

**On Appeal from the County Court at Law**
**Orange County, Texas**
**Trial Cause No. 240440-D**

**MEMORANDUM OPINION**

Father appeals the trial court's order terminating his parental rights to his minor child, L.D.M.W. ("James").[1] In six issues, Father challenges the legal and factual sufficiency of the evidence supporting the best interest finding and the termination grounds specified in section 161.001(b)(1)(D), (E), (M), (N), and (P). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M), (N), (P), (2). We affirm the trial court's Order terminating Father's parental rights.

---

[1] To preserve the privacy of the parties, we use pseudonyms to refer to the child, father, and family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

1

## BACKGROUND

The trial court conducted a bench trial. Mother testified that she signed an Affidavit of Voluntary Relinquishment of her parental rights to James because she believed it was in James's best interest to stay in his current placement. Based on Mother executing the Affidavit of Voluntary Relinquishment of parental rights, the trial court terminated Mother's parental rights to James.

Tracey Marks, an investigator with the Department of Family and Protective Services ("the Department"), testified that the Department removed James after receiving an intake report in July 2024, alleging neglectful supervision of James by Mother. The intake report showed Mother had an open CPS case in Louisiana in which she tested positive for amphetamine and methamphetamine, and that, even though Mother and James tested negative at the time of James's birth, James's meconium results were positive for amphetamine and methamphetamine. Mother denied recently testing positive in Louisiana but admitted to former substance use. Mother had notarized papers for her mother, Maternal Grandmother, to have custody of James upon his release from the hospital. Marks told Mother that due to criminal history and concerns about past drug use, Maternal Grandmother would have to take a drug test and submit to a home study before being considered for placement. During Marks's investigation, Mother never completed a drug test due to her having medical issues and visiting James at the hospital. Marks learned that Maternal Aunt

adopted Mother's and Father's other child, Rhonda, whose meconium was also positive, and that the grounds in Rhonda's case involved substance abuse by Mother. Marks did not recall if Father was incarcerated when Rhonda was born.

Marks learned that Father was the alleged father and spoke with Father at the county jail where she informed him about the new intake and findings concerning James. Father had been incarcerated before James's birth and remained incarcerated during the investigation. Father was unable to attend visits with James due to his incarceration. Father requested DNA testing and wanted James to be placed with Paternal Grandmother in Louisiana. Father did not want James to be placed with Maternal Grandmother due to her past abuse of methamphetamine and because she lived with an alcoholic. The Department determined that Father's concerns about Maternal Grandmother were valid.

Mark's investigation determined that there was reason to believe there was neglectful supervision of James by Mother and that Father was not present during that abuse or neglect. Based on the Department's belief of abuse or neglect, the Department removed James because Mother had engaged in conduct which endangered James's physical health and safety and his emotional well-being. The trial court appointed the Department as James's temporary managing conservator, and upon James's release from the hospital, the Department placed James in a foster home. Marks explained that the allegations for removal were "pretty much" the same

3

in James's and Rhonda's cases and that Father continued to have children with Mother knowing that removal and termination could be the outcome.

Cassie Simon, a case manager with Texas Family Care Network, was assigned to James's case in August 2025, a little over a year after the initial intake. James was in a safe home and had bonded with his foster family. Father was unable to visit James in person because he was still incarcerated, and it was not in James's best interest to visit Father at the jail. Simon explained that Father did not complete the required services in his Family Service Plan to be reunified with James. Simon testified that Father's compliance with his service plan was minimal, and he was unable to complete some services due to his incarceration. Father had prior convictions for which he had been incarcerated and also had a history with the Department. Father's rights to Rhonda were terminated in 2024, and the order of termination in Rhonda's case shows the trial court found that Father, among other grounds, knowingly placed or knowingly allowed Rhonda to remain in conditions or surroundings which endangered Rhonda's physical or emotional well-being and engaged in conduct or knowingly placed Rhonda with persons who engaged in conduct which endangered Rhonda's physical or emotional well-being.

Simon explained that although Paternal Grandmother's home study was approved, the Department did not place James with Paternal Grandmother, who was on social security disability, because of concerns about her physical health, ability

4

to provide long-term care, and financial ability. The Department was also concerned about Father's history of substance use and him moving back to Paternal Grandmother's home after his release. Simon noted that when Father's parental rights to Rhonda were terminated, the Department did not place Rhonda with Paternal Grandmother. Simon reported that Paternal Grandmother and her husband visited James fewer than five times over the past year.

Simon testified that Father could not provide a home for James, and upon his release from prison, Father needed to complete the services on his Family Service Plan before he could be considered for placement. Simon recommended terminating Father's parental rights to James, and she explained it was in James's best interest to remain in his current placement where he spent the first year of his life and be adopted by his foster parents. Simon testified that James was doing "really well[]" in his current placement and had bonded with his foster parents, who were meeting James's medical needs. Simon supported the foster family's desire to adopt James.

Paternal Grandmother believed she had completed the Department's requirements to have James placed in her home, including passing a home study. Paternal Grandmother explained what medications she was taking and that her sleeping medication does not prevent her from waking up at night if she heard a noise. Paternal Grandmother had open-heart surgery four or five years ago, and she has no difficulty caring for her grandchildren. She has chronic obstructive

5

pulmonary disease, a blood disease, and had back surgery about four years ago. Paternal Grandmother's primary care physician sent the Department a letter stating he did not believe her medical status or condition, or medication, would hinder her ability to safely care for a young child.

Father's adopted sister, Julie, resides near Paternal Grandmother, who took Julie and her brother in when CPS removed them from their home. Julie lived with Paternal Grandmother from the ages of sixteen to twenty. Julie, an emergency medical responder, did not think Paternal Grandmother's health issues would affect her ability to care for James. Julie believed that it was in James's best interest to be placed with Paternal Grandmother and her husband because they would provide a good home. Julie and other family members were willing to help Paternal Grandmother care for James. Julie explained that Paternal Grandmother is protective and would not allow Father access to James if he was doing wrong. At the time of trial, Julie did not think it would be appropriate to return James to Father, and she knew Father had a history of using drugs and being in and out of jail.

Father's sister-in-law, Farrah, also lives near Paternal Grandmother. Farrah testified that Paternal Grandmother watches her children and was "always chasing my one-year-old[.]" Farrah had no concerns about Paternal Grandmother's ability to care for James. Farrah had never met Father, but she knew he had used drugs and was in jail. Farrah believed it was in James's best interest to be placed with Paternal

6

Grandmother and that the family could provide a good environment for James. Farrah did not think Father's rights should be terminated because he deserved to have a chance to be a father to James.

Father's eighteen-year-old daughter, Karen, testified that she lived with Paternal Grandmother, who adopted her, for about thirteen years after CPS removed her from her mother's care and terminated her parents' parental rights. Karen was not placed with Father because he was incarcerated, and she did not have "the greatest[]" relationship with Father because he was not in her life as he should have been because he was "so far in the drugs that he wasn't really worried about me at the time."

Karen has a younger sister, Laura, who is also Father's daughter, and he did not raise Laura because of his drug use. Karen testified that Father had a history of drug use and did not make good choices. Karen agreed that Father's rights had been terminated in two other cases and that the trial court should terminate Father's parental rights to James. Karen testified that Paternal Grandmother and her husband took great care of her and provided for her physical, emotional, and educational needs. Karen believed it would be in James's best interest to be placed in Paternal Grandmother's home.

Laura, Father's seventeen-year-old daughter, had been living with Paternal Grandmother and her husband for the past two years, and she also lived with Paternal

7

Grandmother between the ages of one or two and four. Laura said it was "pretty decent[]" living with Paternal Grandmother, who provides for her needs. Laura's uncles and aunts visit almost every day. Laura spent her childhood living back and forth between her mother and Father, with whom she lived for a couple of months. Laura wanted James to be placed with Paternal Grandmother.

Paternal Grandmother had about four monthly visits with James and did not know why the visits stopped. Paternal Grandmother and her husband smoke mostly outside the home since finding out James may be placed in her home. She stated she had adequate resources to care for James, and her family was willing to help care for James. Part of her income included disability income for her back. Paternal Grandmother explained that she had partially raised two of Father's daughters, Karen and Laura, and she did not let Father come to visit if he was "screwed up." Paternal Grandmother would follow the Department's rules about Father having access to James and would address James's health condition. She did not know that the Louisiana approval for James to be placed in her home had expired. Paternal Grandmother agreed that James would view her as a stranger, but she believed it was best for James to be with his family and placed with her.

Paternal Grandmother explained that Father, who is in his thirties, has had problems with drugs since he was about twenty years old, and the mothers of his children were drug users. Father's relationships with his children and Paternal

8

Grandmother were problematic. Paternal Grandmother knew that Father had been arrested for drugs "quite a few times[,]" but she did not agree that it was in James's best interest that Father's parental rights be terminated.

Paternal Grandmother's husband, Chad, testified that Father is his stepson. Chad knew that Father had been in and out of jail. Chad testified that Laura came to live with them for about a year when she was around four to six years old, and Laura returned to their home last year because she was homeless. Chad explained that Paternal Grandmother could not work because of her medical condition and being unable to stand for several hours at a time, but she could care for James, and they could financially afford it. Chad testified that their grandchildren were constantly at their home, and he wanted James to be placed in their home. Chad agreed that he had not seen James on many occasions and that James would view him as a stranger. At the time of trial, Chad was fifty-eight years old and Paternal Grandmother was fifty-seven.

Father's brother, Aaron, testified that he lives near Paternal Grandmother and visits her all the time. Aaron's children love Paternal Grandmother and Chad. Aaron explained that he and his wife would assist Paternal Grandmother with raising James. Aaron did not believe Paternal Grandmother's health would affect her ability to raise James.

9

Father wanted James to be placed with Paternal Grandmother, who passed a home study, but the Department refused his request. At the time of trial, Paternal Grandmother's home study had expired, and the Department had "not moved forward[]" with an updated home study. In June 2024, Father was sentenced to four years in prison for possession of a controlled substance, methamphetamine, and had been continuously incarcerated both before and after James's birth. Father testified that he was projected to be released in a couple of months.

Father testified that after the trial court terminated his parental rights to Rhonda, he went to jail for an older case but had not committed any new crimes. Father believed in God and had been making efforts to change. After his release, Father planned to live in a sober living facility for two years. Concerning his Family Service Plan, Father had completed the services he could complete while in jail. Father understood the trial court would not place James with him and intended to follow the trial court's rules if James were placed with Maternal Grandmother. Father hoped to have James placed with his family so he could have a relationship with James. Father believed it was in James's best interest to be placed with Maternal Grandmother.

Concerning his older daughter, Karen, Father explained that he went to jail for burglarizing a building when she was supposed to be placed with him, so Karen was placed with Maternal Grandmother. Father was upset that Karen was placed

10

with Maternal Grandmother, and after his release from jail, he started using drugs, became addicted, and became angry about Maternal Grandmother's rules about Karen. At that point, Father had Laura but was in jail until Laura was six months old. Father explained that he took Laura from her mother, who had dropped her, and cared for her for six years until Laura's mother took Laura from school one day. After failing to get Laura back from her mother, Father fell back into his addiction with drugs. Father has seven felony convictions, had served time for five felonies, and agreed that he was using drugs when Rhonda was born and that both Rhonda and James had illegal substances in their meconium at birth. Father also admitted he was a former gang member.

Foster Father, a mechanical engineer, testified that James had lived with him and his wife since James was eighteen days old. James was receiving medical care for his kidney blockage. Foster Father was financially stable, and his new promotion allowed him to work from home. Foster Father described James as being "very happy[]" and attached to both him and his wife. He testified that removing James from their home would be detrimental to James because James is happy with his daily routine and is thriving. Foster Father stated he would like James to remain in their home, and Foster Father created a private Instagram page to share James's photographs with Mother's and Father's families. Foster Father and his wife wanted

11

to adopt James, and Foster Father believed it was in James's best interest to remain in their home and for Father's parental rights to be terminated.

Dorothy Stanley, James's guardian ad litem, testified that she recommended that James remain in his current placement and that Father's parental rights be terminated so James could be adopted by Foster Father and his wife. Stanley believed her recommendations were in James's best interest because they would provide James with permanence.

The trial court found that it was in James's best interest to terminate Father's and Mother's parental rights. During its oral pronouncement, the trial court found that the grounds that support terminating Father's parental rights included sections 161.001(b)(1)(D), (E), (M), (N), and (P). The trial court's written Order of Termination fails to include that it terminated Father's parental rights under section 161.001(b)(1)(N). The trial court appointed the Department as James's permanent managing conservator and found that it was in James's best interest to remain with his foster family and be adopted by them.

## ANALYSIS

In issue one, Father contends the evidence is legally and factually insufficient to support termination of his parental rights under section 161.001(b)(1)(D) of the Family Code, and in issue two, Father argues the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(E). *See id.* §

161.001(b)(1)(D), (E). In issue three, Father challenges the legal and factual sufficiency of the evidence supporting termination of his parental rights under section 161.001(b)(1)(M). *See id.* § 161.001(b)(1)(M). In issue four, Father challenges the legal and factual sufficiency of the evidence supporting termination of his parental rights under section 161.001(b)(1)(N). *See id.* § 161.001(b)(1)(N). In issue five, Father challenges the legal and factual sufficiency of the evidence supporting termination of his parental rights under section 161.001(b)(1)(P). *See id.* § 161.001(b)(1)(P). In issue six, Father contends the evidence is legally and factually insufficient to demonstrate that termination of his parental rights is in James's best interest. *See id.* § 161.001(b)(2). We address issues one through six together.

We note that the State points out that Father failed to challenge the trial court's finding under section 161.001(b)(1)(P) and that the unchallenged ground is sufficient to support termination of Father's parental rights. The current version of section 161.001(b)(1)(P), which applies in this case, is based on knowingly engaging in criminal conduct that has resulted in Father's conviction for an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition.[2] *See id.* § 161.001(b)(1)(P). In his brief,

---

[2] The Legislature amended section 161.001 in the 2025 regular session. The amendment in relevant part deleted ground for termination (O) and relettered grounds (P) and (R) as grounds (O) and (Q), respectively. *See* Act of May 14, 2025, 89th Leg., R.S., Ch. 211, § 2, 2025 Tex. Gen. Laws ___, ___ (eff. Sept. 1, 2025) (amending Tex. Fam. Code § 161.001(b)(1)). The amendment was effective on

Father mistakenly argues that the current version of section 161.001(b)(1)(P) is based on his use of a controlled substance in a manner that endangered the health or safety of the child, failure to complete a court-ordered substance abuse treatment program, or after completion of a program, continued to abuse a controlled substance. Father's argument is based on the prior version of section 161.001(b)(1)(P), which does not apply in this case. *See* Act of May 14, 2025, 89th Leg., R.S., Ch. 211, § 2, 2025 Tex. Gen. Laws ___, ___ (eff. Sept. 1, 2025) (amending Tex. Fam. Code § 161.001(b)(1)). While the State is correct that Father's brief does not challenge the trial court's finding under the current version of subsection (P), because Father's termination is ordered under subsections (D) and (E) we must review those grounds because they can provide the basis for future terminations. *See In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019); *In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.— Houston [14th Dist.] 2014, pet. denied); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(M).

Under legal sufficiency review, we review all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have

---

September 1, 2025, and applies to "suits affecting the parent-child relationship that [were] pending in a trial court" on September 1, 2025. This case was pending on that date, and the trial court terminated Father's rights on December 3, 2025.

14

formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

Under factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its ruling. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

The decision to terminate parental rights must be supported by clear and convincing evidence, i.e., "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more

15

predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001; *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C. Jr.*, No. 09-10-00477-CV, 2011 WL 1744139, at *1 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.). As stated above, when, as here, a parent challenges a trial court's findings under section 161.001(b)(1)(D) or (E), we must review the sufficiency of those grounds as a matter of due process and due course of law. *In re N.G.*, 577 S.W.3d at 235.

Section 161.001(b)(1)(D) of the Family Code allows for termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). The endangerment analysis under subsection (D) focuses on evidence of the child's physical environment but allows termination if the Department proves the parent's conduct caused the child to be placed or remain in an "endangering environment." *Jordan v. Dossey*, 325 S.W.3d 700, 721-23 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The endangering conditions or surroundings include unlawful conduct by persons who live in the

16

child's home. *Id.* Subsection D allows for termination based on a single act or omission. *Id.*

Section 161.001(b)(1)(E) allows for termination if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(E). "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). A parent's conduct in the home can create an environment that endangers the child's physical and emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

For purposes of subsection (E), endangerment means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *In re M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.--El Paso 2019, no pet.). Termination under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re M.L.L.*, 573 S.W.3d at 363-64. A parent's conduct that subjects a child's life to instability

17

and uncertainty endangers the emotional or physical well-being of a child. *Id.* at 363. Endangerment is not limited to actions directed toward the child and includes the parent's actions before the child's birth and while the parent had custody of older children, including evidence of drug usage. *In re J.O.A.*, 283 S.W.3d. at 345. Courts may consider whether a parent's drug use continues after the child is removed from the parent's care, as such conduct shows a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.— Houston [1st Dist.] 2019, no pet.); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.— Fort Worth 2011, pet. denied).

"[I]ntentional criminal activity which expos[es] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.— Amarillo 2001, no pet.) (citation omitted). "[W]hen all of the evidence, including imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding under section 161.001(1)(E) is supportable." *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987)). "If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child." *Id.* (citation omitted).

The trial court heard that the Department removed James because Mother had engaged in conduct that endangered James's physical health and safety and his emotional well-being and that Father was not present during the abuse or neglect because he was incarcerated. The trial court heard that the allegations for James's removal were "pretty much" the same in James's and Rhonda's cases and that Father continued to have children with Mother knowing that removal and termination could be an outcome. Both James's and Rhonda's meconium results were positive for drugs.

The trial judge heard evidence that Father has a history with the Department. The trial court heard that Father's parental rights to Rhonda were terminated in April 2024 and that the termination grounds included subsections (D) and (E). Karen testified that she was not placed with Father when CPS removed her from her mother's care because Father was incarcerated and that she did not have the greatest relationship with Father because of his drug use. Paternal Grandmother explained she had partially raised two of Father's daughters and that Father's relationships with his children were problematic.

The trial court considered the Department's concerns about Father's history of drug use and having children with women who were drug users. The trial court heard evidence that Father was using drugs when Rhonda was born. Father admitted

19

that after he was released from prison, he became addicted to drugs, and he continued to use drugs after he lost possession of his daughters.

The trial court heard that Father had been incarcerated prior to James's birth and remained incarcerated throughout James's case. Due to his incarceration, Father was unable to attend visits with James, complete the services in his Family Service Plan, and provide a stable home for James. The record includes a Judgment of Conviction by Court which shows that on September 12, 2024, Father pleaded guilty to felony possession of a controlled substance, was sentenced to three years of confinement in prison, and given credit for 162 days in jail. The trial court considered evidence that Father had been in and out of jail, was a former gang member, had seven felony convictions, and had served time for five of the felonies. Father admitted that he was unable to care for James and his daughters due to his incarcerations. Even though Father's offenses occurred before James was born, they can still be considered as part of a voluntary, deliberate, and conscious course of conduct that had the effect of endangering James. *See In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Viewing the evidence in the light most favorable to the trial judge's findings, we conclude that the trial judge could reasonably have formed a firm belief or conviction that Father knowingly placed or knowingly allowed James to remain in conditions or surroundings that endangered James's physical or emotional well-

20

being and engaged in conduct or knowingly placed James with persons who engaged in conduct that endangered James's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266; *In re J.S.*, 584 S.W.3d at 635; *In re M.L.L.*, 573 S.W.3d at 363; *Walker*, 312 S.W.3d at 617; *In re M.R.J.M.*, 280 S.W.3d at 502; *In re J.T.G.*, 121 S.W.3d at 125.

Regarding the best interest inquiry, we consider a non-exhaustive list of factors: (1) the desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code Ann. § 263.307(b). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in a child's best interest. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The best interest determination may rely on direct or

21

circumstantial evidence, subjective facts, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

"A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). Evidence of a parent's continued drug use supports a finding that the parent poses a present and future risk of physical or emotional danger to the child and that termination would be in the child's best interest. *See In re S.N.*, 272 S.W.3d 45, 53 (Tex. App.—Waco 2008, no pet.).

With respect to the best interest of James, the trial court heard evidence that Father (1) had been incarcerated throughout the case, (2) failed to complete his services in his Family Service Plan, (3) failed to provide an appropriate home for James to return to, (4) was unable to visit James due to his incarceration, (5) planned to live in a sober living facility for two years after his release, and that (6) James has stability in his current placement, which is willing to adopt him.

Simon, the case manager, testified that James was doing well in his placement where he had spent the first year of his life and had bonded with his foster family, who were providing for his needs. Simon explained it was in James's best interest that Father's parental rights be terminated so James could be adopted by his foster family. Father's adopted sister testified that it would be inappropriate to return James

22

to Father, who had a history of using drugs and being in and out of jail. Father's daughter, Karen, testified that Father's rights had been terminated in two other cases and that the trial court should terminate Father's parental rights to James. James's guardian ad litem also recommended terminating Father's parental rights so James could be adopted and have permanence. Foster Father believed it was in James's best interest to remain in his home where James was happy and thriving and for Father's parental rights to be terminated. Mother also believed it was in James's best interest to stay in his current placement.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a). As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the trial court could reasonably conclude that termination of Father's parental rights is in James's best interest. *See id*. § 161.001(b)(2), 263.307(a); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72; *In re S.N.*, 272 S.W.3d at 53; *In re M.R.*, 243 S.W.3d at 821.

We conclude that the Department established, by clear and convincing evidence, that Father committed the predicate acts enumerated in sections 161.001(b)(1)(D) and (E) and that termination of Father's parental rights is in James's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2); *In re C.A.C. Jr.*, 2011 WL 1744139, at *1. Accordingly, we overrule issues one, two, and

23

six. Having concluded that the evidence was legally and factually sufficient to support the trial court's findings as to sections 161.001(b)(1)(D), (E), and (2), we need not reach issues three through five, in which Father challenges the sufficiency of the evidence supporting the trial court's findings under sections 161.001(b)(1)(M), (N), and (P). *See In re N.G.*, 577 S.W.3d at 235; *In re C.A.C. Jr.*, 2011 WL 1744139, at *1; *see also* Tex. R. App. P. 47.1.

Having addressed each of Father's issues, we affirm the trial court's Order terminating Father's parental rights.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on April 20, 2026
Opinion Delivered May 7, 2026

Before Golemon, C.J., Johnson and Wright, JJ.